UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICKSON'S FLOORING & SUPPLY CO., INC.

    Plaintiff,

                                          Case No. 04-74990
v.                                       Hon. Gerald E. Rosen

BASIC COATINGS, INC.,
THE ATLAS COMPANIES, INC.,
and NELS INGEBRIGTSEN,

    Defendants.
_____/

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    September 28, 2007

PRESENT:   Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

On December 22, 2004, Plaintiff Erickson's Flooring & Supply Co., Inc. ("Erickson's") brought suit under the Sherman Act, 15 U.S.C. §1, the Clayton Act, 15 U.S.C. §14 and §16, and the Robinson-Patman Act, 15 U.S.C. §13(a), challenging the actions of Defendant Basic Coatings, Inc. ("Basic") in terminating price discounts previously enjoyed by Plaintiff, and then ending Plaintiff's distributorship with Basic completely. Plaintiff also alleges state law claims for business libel and slander, detrimental reliance, breach of contract, unfair competition, unjust enrichment, misrepresentation, and tortious interference with contractual relationships and advantageous business expectancies. Also named as defendants in this lawsuit are The Atlas

1

Companies, Inc., Basic's parent corporation, and Erickson's Decorating Products, Inc. (which has no affiliation with Plaintiff).[1] Additionally, Plaintiff alleges state-law slander claims against Nels Ingebrigtsen, who was once an employee of Basic. Federal court jurisdiction is predicated upon federal question jurisdiction under 28 U.S.C. §1331, and supplemental jurisdiction under 28 U.S.C. § 1367 with respect to the state law claims. Defendants responded to Plaintiff's Complaint by way of a Fed. R. Civ. P. 12(b)(6) motion to dismiss. At a scheduling conference on March 7, 2005, the Court advised defendants that it deemed their motion for dismissal premature and ordered discovery.

Defendants subsequently refiled their motion to dismiss on April 28, 2006. Plaintiff responded and, at the same time, moved to hold defendants in contempt for failure to produce records that had been duly subpoenaed and/or which defendants had been previously ordered to produce.[2] After hearing Plaintiff's contempt motion, on September 8, 2006, the Court ordered that defendants and Betco, Inc., Basic's successor-in-interest, be held in contempt until they produced the requested records. On October 24, 2006, Plaintiff reported to the Court that it had received from defendants 164 boxes of documents but asked that the Court continue to hold defendants in contempt until it could ascertain whether the documents produced were responsive to its discovery requests. That was more than 11 months ago and the Court has not heard back from Plaintiff. Meanwhile, defendants' motion to dismiss/for summary judgment remains

---

[1] By stipulation, Plaintiff's claims against Erickson's Decorating Products were dismissed, with prejudice.

[2] Plaintiff argued in response to Defendants' motion to dismiss that it was unable to provide evidence to support its claims because of Defendants' failure to comply with discovery requests.

pending.

Although Plaintiff has had substantial time to come forward with evidence to supplement its response to defendants' motion to dismiss, Plaintiff has failed to come forward with any additional evidence to support its claims in this lawsuit. Therefore, for the reasons set forth below, the Court has determined that defendants' April 28, 2006 motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 should be granted.

## II. FACTUAL BACKGROUND

Plaintiff is a wholesale distributor of hardwood flooring, doing business primarily in Michigan, Ohio, Indiana, and Illinois. Until April 8, 2005, Basic was a manufacturer of coatings and other products for residential, commercial, and sports flooring. For over fifteen years, Plaintiff was a distributor of Basic products pursuant to a distribution agreement with Basic.

Basic offered discounts to its distributors, discounts pf which Plaintiff took advantage for many years. In a 1999 letter to Plaintiff, Basic wrote, "As in the past, discount categories are determined based on previous year's sales." (*See* Plaintiff's Response in Opposition to Defendants' Joint Motion for Judgment and Defendants' Refiled Motion Under Fed. R. Civ. P. 12(b)(6) to Dismiss Complaint, Ex. 5).

As part of its arrangement with its distributors, Basic had a "Distributor Drop Ship and Resale Policy." That policy read, in relevant part:

> The opening of distributors, or resellers, is the responsibility of Basic. Selling Basic products to anyone who is in the distributor/resale business requires Basic's approval.
>
> Basic does have a "Drop Ship" program that may be used by distributors within their region when approved by Basic. Prior to shipping, any new drop ship address will be reviewed by management to ensure there are no conflicts with

current distribution strategy.

> Violation of this policy will result in the loss of all discounts for a period of six (6) months. Continued violations may result in the termination of Basic distribution.

(Complaint, Ex. A).

Plaintiff contends that Basic only promulgated the "Drop Ship" policy in July 2002.

On August 8, 2002, Plaintiff's President, Rick Walters, wrote a letter addressed to Mary Middleton, CEO of Basic, and Mike Sundell, President of Basic. The letter read, in part:

> This letter is in response to your letter dated July 16, 2002.
>
> Based on the same multiple conversations you reference in your letter, specifically with Mr. Blackburn and Mr. Sundell, a number of issues came to light. Erickson's indeed became aware of Basic's drop-ship policy as of the conversation with Mr. Blackburn. At the same time Erickson's made Basic aware of concerns regarding Mr. Ingebrigtsen controlling the drop-ship program. Mr. Ingebrigtsen has made very clear that Erickson's is to "stay away" from his customer's [sic] (referring to contractors in the Northern Illinois trade area). This was clearly a conflict of interest. I now understand that Mr. Sundell controls the drop-ship program. Thank you.
>
> I also understand that the intent of the Drop-ship resale policy is to have Basic's recognized distributors, [sic] grow business within their territory. I applaud your formalization of this philosophy. . . . Erickson's has for many years made Basic aware that there are a number of distributors who have consistently sold Basic products in the Michigan market. I am interested in how Basic intends to manage this part of the program.
>
> Reviewing Erickson's performance, we grew our Basic Coatings sales [sic] double digits annually, 1996 through 1999. Only after Basic increased flooring distribution by four-fold (Rivershore, Smith, Premium) did Erickson's performance suffer 1999 through 2001 [sic]. Did Basic capture the market share they sought based on the Michigan distributor additions made? Erickson's has been very successful when competing on a level playing field. I request a meeting to discuss the aforementioned issues to create just that, a level playing field. Erickson's remains committed to not only support, but also build market integrity [sic].

(Complaint, Ex. B).

On February 5, 2003, Walters wrote an email to Sundell to inform Sundell of "a very unprofessional incident that occurred at the recent Surfaces trade show" in which "Nels Ingebrigtsen, your agent, verbally accosted Mr. Greg Williams and myself." (Complaint, Ex.C).

On April 22, 2003, Sundell sent the following letter to Walters:

> We have had this conversation before, but A American is reselling Street Shoe and other Basic products again. The last time this happened we stopped your 10% discount and then reinstated the discount after you asked for time to address this issue.
>
> The lot numbers in their inventory were shipped to you in Detroit just last week. These materials are coming from you to them and being resold. This is against our distribution policy that allows **us** to control the number of distributors in a market [emphasis in original].
>
> Because you do not seem to take our request seriously, we are forced to stop your discounts effectively immediately. If you continue to sell them for resale, we will be forced to discontinue your Basic distributorship.

(Complaint, Ex. D).

Plaintiff does not dispute that it sold Basic's product to A American.

On April 25, 2003, Plaintiff responded to this letter through its counsel, and on July 8, 2003, Basic terminated Plaintiff's Basic distributorship.

## III. ANALYSIS

In assessing defendants' motion for summary judgment, this Court reviews the record to see whether genuine issues of material fact exist as to essential elements of the non-movant's case. In this inquiry, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2513 (1986). However, the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in

5

order to defeat a properly supported motion for summary judgment." *Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The trial court does not have a duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id*. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. *Id.*

**A.     The Sherman Act Claims**

Plaintiff alleges, as the factual predicate for its Sherman Act claim, that Basic had a preferential relationship with other Basic distributors who competed with Plaintiff, and that Basic discriminatorily limited the customers to whom Erickson could resell. Plaintiff thus alleges that Basic engaged in vertical non-price restraints.[3] Such vertical non-price restraints are analyzed under the "rule of reason." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57-58 (1977).

---

[3] Plaintiff's complaint also alleges that the defendants engaged in "'horizontal' restraints of trade, by taking the direction and/or coercion of its customer, defendant Erickson Decorating Products, and possibly other companies who compete with plaintiff, to suppress or substantially lessen competition by threatening plaintiff, and then eliminating plaintiff's distributorship." (Complaint, ¶32). Horizontal restraints of trade are ordinarily *per se* illegal. *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 315 n. 8 (8th Cir. 1986). Plaintiff's "horizontal restraint" claim cannot survive defendants' summary judgment motion, however, because Plaintiff does not direct the Court to anything in its materials opposing defendants' summary judgment motion which would lend support to any theory of "direction and/or coercion" of defendants by Erickson's Decorating Products, or any other competitor of Plaintiff's.

Similarly, though Plaintiff puts forward a price-fixing theory, Plaintiff directs the court to nothing in its materials which would lend any support to the notion that there was, between Basic and any of its distributors, "an express or implied agreement to set resale prices at some level." *Business Electronics Co. v. Sharp Electronics Co.*, 485 U.S. 717, 720 (1988).

6

In a "rule of reason" case, "the plaintiff must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets." *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003); *accord Capital Imaging Associates v. Mohawk Valley Medical Associates*, 996 F.2d 537, 543 (2d Cir. 1993) ("[the] plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.").

This initial element requires the plaintiff to "show an anti-competitive effect, either in the intrabrand or interbrand market." *Chase v. Northwest Airlines Co.*, 49 F. Supp. 2d 553, 568 (E.D. Mich. 1999) (quoting *Graphic Products Distributors, Inc. v. Itek Corporation*, 717 F.2d 1560, 1571 (11th Cir.1983)).[4]

*Itek* dealt with the claim of a terminated distributor, Graphic Products Distributors ("GPD"), who claimed that Itek's policy of limiting distributors "to reselling its products only within a designated geographical territory, and only to customers within that territory" violated §1 of the Sherman Act. *Id.* at 1565. In considering GPD's argument that Itek's policy had an anticompetitive effect at the intrabrand level, the *Itek* Court, noting that "[t]he burden of proving

---

[4] The distinction between "interbrand" and "intrabrand" competition has been explained as follows: "Interbrand competition is the competition among the manufacturers of the same generic product . . . and is the primary concern of antitrust law. . . . In contrast, intrabrand competition is the competition between the distributors wholesale or retail of the product of a particular manufacturer." *Sylvania* at 52 n. 19.

Though defendants argue that, in cases involving a manufacturer's termination of a distributor, the party complaining of a Sherman Act violation must allege anticompetitive effect at the interbrand level, a restraint affecting only intrabrand competition may be cognizable under the Sherman Act, depending on the characteristics of the relevant interbrand market. *Itek* at 1572 n. 20.

7

unreasonable effects [in a rule of reason case] rests with the antitrust plaintiff," *id*. at 1573 (internal quotation marks omitted), held that:

> GPD, after crossing the threshold of showing Itek's market power, was required to establish that the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence of consumer welfare. GPD was also required to show that the nature and effects of the restraint were such as to be "substantially adverse" to market competition.

*Id.*

In the instant case, Plaintiff does not present any theory as to how Basic's actions reduced competition at either the interbrand or intrabrand level. Plaintiff argues that Basic, because it preferred its Chicago-area distributors, imposed restrictions on Plaintiff that it did not impose on its other distributors, and then ended Plaintiff's distributorship contract. Plaintiff thus does not argue that defendants' conduct reduced competition at the interbrand level, as between Basic and its competitors.[5] But neither does Plaintiff argue that Basic's conduct reduced competition as a whole at the intrabrand level, as between the various distributors of Basic's products. Instead, Plaintiff's complaint asserts that "Basic's marketing strategy that allowed other distributors to (a) sell to commercial customers within the territories which plaintiff covered; (b) sell to individual customers within plaintiff's territories; and (c) sell to resellers within plaintiff's territories, tolerated and encouraged intrabrand competition." (Complaint, ¶31).

Plaintiff is thus left to argue that, even though Basic generally "tolerated and encouraged intrabrand competition," Basic's failure to prohibit other distributors from marketing Basic's

---

[5] Indeed, Plaintiff argues that it "is *not* a competitor of defendants Basic and Atlas." (Plaintiff's Response in Opposition to Defendants' Joint Motion for Judgment Pursuant to Rule 56(c) and Defendants' Refiled Motion Under Fed. R. Civ. P. 12(b)(6) to Dismiss Complaint at 8) (emphasis in original).

products in the Michigan area, enforcement of restrictions on whom Plaintiff could resell to, and specific action of terminating Plaintiff's distributorship had the effect of reducing intrabrand competition.

But to demonstrate anticompetitive effect, Plaintiff is required to do more than allege that it has been harmed as an individual competitor.[6] *Capital Imaging Associates* at 543. It is well-settled that, without more, a manufacturer's breach of a distributorship contract does not constitute an antitrust violation. *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975) ("[W]e reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.").

Plaintiff points to nothing which might establish a genuine issue of material fact as to whether Basic's conduct had an anticompetitive effect at the level of interbrand or intrabrand

---

[6] As evidence that Basic's conduct decreased competition, Plaintiff points to a portion of its deposition of its President, Rick Walters, and a portion of its deposition of Albert Maghes, Plaintiff's Vice President of Sales and Marketing. The portion of Walters's deposition testimony alleges that Plaintiff was treated unfairly by Basic, but does not refer to any reduction in competition as a whole in the intrabrand market as a result of Basic's conduct, or indeed to any effect of the conduct of Basic on any distributor besides Plaintiff. (Plaintiff's Response in Opposition to Defendants' Joint Motion for Judgment Pursuant to Rule 56(c), Ex. 1 at 94-95). Plaintiff also points to a portion of Maghes's deposition testimony in which Maghes refers to Basic's "marketing strategy to allow anybody that had the product to sell it anywhere" and alleges that this strategy "was very negative to Basic Coating and their local distributor" because it "discourage[d] the local guy who's doing the work in creating the sale from moving forward and increasing, increasing sales for myself and Basic." (*Id.*, Ex. 3 at 108). Taken in the light most favorable to Plaintiff, Maghes here alleges that Basic as a matter of policy did not enforce or enter into exclusive distributorship arrangements, and argues that this harmed certain "local" distributors. But Maghes says nothing about the effect of such conduct by Basic on competition as a whole in the intrabrand market, as opposed to its effect on individual distributors who might be in a position to benefit from exclusive distributorship arrangements.

9

competition. Having failed to make such a showing, Plaintiff's Sherman Act claim must be dismissed.

**B.      The Robinson-Patman Act Claims**

Plaintiff also has alleged a claim against defendants under §2(a) of the Robinson-Patman Act. The relevant portion of the Act reads:

> It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

15 U.S.C. § 13(a).

It is well-established that "Robinson-Patman does not ban all price differences charged to different purchasers of commodities of like grade and quality'; rather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Volvo Trucks North America, Inc. v. Reeder-Simco GMC*, 546 U.S. 164, 126 S.Ct. 860, 870 (2006) (internal quotation marks omitted). Under the Robinson-Patman Act, there are three types of cognizable competitive injury: primary-line, secondary-line, and tertiary-line. *Id*. Plaintiff does not present a theory of primary-line discrimination, but only presses a theory of secondary-line discrimination. Secondary-line discrimination "involve[s] price discrimination that injures competition among the discriminating seller's customers; cases in this category typically refer to 'favored' and 'disfavored' purchasers." *Id*.

To establish a secondary-line discrimination claim, a plaintiff must satisfy four elements. He must show that: (1) the relevant sales were made in interstate commerce; (2) the products were of like grade and quality; (3) the seller discriminated in price between the plaintiff and

10

another purchaser; and (4) the effect of such discrimination may be to injure, destroy, or prevent competition to the advantage of a favored purchaser, i.e., one who received the benefit of such discrimination. *Id*. Though "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time," the favored and disfavored purchasers must be in "actual competition" with one another for the Robinson-Patman Act plaintiff to prevail. *Id*. Additionally, pursuant to the fourth element, the complained-of price-discrimination must be "of such magnitude as to affect substantially competition" between the favored and disfavored purchaser. *Id*. at 872.

Plaintiff's Robinson-Patman Act claim involves two allegations: first, that Plaintiff suffered losses due to price discrimination by Basic prior to the revocation, on April 22, 2003, of the 10 percent discount on Basic products which Plaintiff had enjoyed to that point; and second, that Plaintiff suffered losses due to Basic's termination of its discount subsequent to April 22, 2003. The two claims must be evaluated separately, because they involve different factual predicates: the first of Plaintiff's two theories claims losses stemming from secretive preferential pricing schemes between Basic and other distributors which disfavored Plaintiff; the second theory claims losses stemming from Basic's announced decision to terminate Plaintiff's discount.

Plaintiff's first theory finds its only potential evidentiary support in the following statement from the deposition of Albert Maghes, Plaintiff's Vice President of Sales and Marketing: "I think there was a different price there to Erickson's Decorating at that point in time. It just didn't make much sense. It forced us to sell All Sport, Bob Rzepecki, at a warehouse price that was a very, very low margin." (Plaintiff's Response Brief, Ex. 3 at 128-

11

129).[7]

Leaving aside the speculative nature of this testimony, Plaintiff has offered no evidence that the discrimination "substantially" affected competition between it and the favored purchaser.

In *Volvo Trucks*, the Court considered a claim that a truck manufacturer, Volvo, engaged in secondary-line price discrimination in violation of the Robinson-Patman Act when it did not grant one distributor, Reeder, price concessions as favorable as those that it granted to other distributors in a competitive bidding situation. The court noted that, of the two instances Reeder provided where another distributor was granted a more favorable price concession than Reeder received, "Reeder's evidence showed loss of only one sale to another Volvo dealer, a sale of 12 trucks that would have generated $30,000 in gross profits for Reeder." *Volvo Trucks* at 872. The Court also noted that Volvo only granted the larger discount in that case after the "favored purchaser" had lost the bid. In light of this evidence, the Court found that, "if price discrimination between two purchasers existed at all, it was not of such magnitude as to affect substantially competition between Reeder and the 'favored' Volvo dealer." *Id*.

In the present case, Plaintiff provides evidence of only one instance of discriminatory pricing towards one other distributor in relation to only one customer. Indeed, Plaintiff's claim

---

[7] Maghes also alleges in his testimony Basic was giving another distributor, Acme Flooring, inventory on consignment. But Maghes concedes that Basic "was not selling them [product]" but "giving them product." (Plaintiff's Ex. 3 at 132). Maghes thus fails to allege a "sale," as is required to state a Robinson-Patman Act claim. Indeed, a consignment arrangement does not implicate the antitrust laws "so long as the contractual relationship between the parties reflects a true consignment rather than a disguised sale of the goods." *Miller v. W.H. Bristow, Inc.*, 739 F. Supp. 1044, 1052 (D.S.C. 1990); *accord E & L Consulting, Ltd. v. Doman Industries Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006) (Robinson-Patman "applies only to price discrimination between different purchasers" and "consignment contracts are not covered.") (internal quotation marks omitted). Nothing in Maghes's testimony indicates that the consignment arrangement was a "disguised sale."

is weaker than the one pressed in *Volvo Trucks*, because Plaintiff does not claim that the allegedly lower prices given to Erickson's Decorating even cost it any sales; it alleges that this discrimination hurt its profit margin at only one point in time, in relation to only one customer. Because Plaintiff has provided no evidence that the alleged price concession might have had anything approaching a "substantial" effect on competition between it and Erickson's Decorating, or any other Basic distributor, this portion of its Robinson-Patman Act claim must fail.

In addition, Plaintiff provides no evidence that the price discrimination lasted "over time," which is also a required component of the fourth, "harm to competition" element of a secondary-line Robinson-Patman Act claim. *Industrial Burner Systems, Inc. v. Maxon Corp.*, 275 F. Supp. 2d 878, 888 (E.D. Mich.2003). Rather, Plaintiff only points to a one-time instance of discriminatory pricing, with no evidence of any time duration at all.

Plaintiff's claim that the termination of its discount violated the Robinson-Patman Act must also fail. Under the Robinson-Patman Act, "a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available." *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir.1983).

The functional availability doctrine "does not mandate that every customer be permitted to participate [in a discount program] to the same extent as every other customer." *L. S. Amster & Co., Inc. v. McNeil Laboratories, Inc.*, 504 F. Supp. 617, 624 (S.D.N.Y. 1980). Indeed, "[t]hat [otherwise equal] treatment yields a more advantageous result for one distributor than for another due to factors. . . solely within each distributor's control cannot convert the practice into a violation of the Robinson-Patman Act." *Id.* (quoting *Edward J. Sweeney & Sons, Inc. v.*

*Texaco, Inc.*, 478 F.Supp. 243, 283 (E.D. Pa.1979)).

In *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101 (6th Cir. 1981), the Sixth Circuit dealt with an employment contract pursuant to which Robinson, Shreve's sole shareholder and president, became an employee of Clay. One provision in that contract provided that Shreve, a Clay distributor, could not receive volume discounts from Clay so long as Robinson was employed with Clay. In dismissing Shreve's price discrimination claim on the "functional availability" ground, the court stated:

> It was not the existence of the discount program which caused Shreve's alleged injury, but Robinson's choice of employment relationship with Clay which caused the loss of the discount and Shreve's alleged injury. Although the discounts were available to Shreve, it did not take advantage of the discount program because of the benefits it received from Robinson's employment with Clay.

*Id.* at 107.

Thus, the "functional availability" doctrine does not demand that the distributor actually consent to the loss of its discount; rather, the distributor's discount may be terminated by conduct by the distributor inconsistent with some policy of the seller.

In the present case, it is undisputed that Plaintiff received a 10 percent discount from Basic until Basic discontinued that discount in its April 22, 2003 letter. It is, additionally, not disputed that, by July of 2002, Plaintiff knew of Basic's Distributor Drop Ship and Resale Policy. Finally, it is not disputed that Plaintiff resold its goods to A American without Basic's permission, in violation of the terms of Basic's Distributor Drop Ship and Resale Policy.

The terms of the discount program itself provided that repeated violators might have their discount terminated. Plaintiff was not excluded from this program; rather, Plaintiff's discount was terminated pursuant to the terms of the discount program itself. Plaintiff does not dispute

14

this, but argues simply that after Basic's April 22, 2003 letter, the discount was no longer "functionally available" to it. This argument, however, only begs the question of the underlying validity of the portion of Basic's discount policy providing that continued violation of the policy might result in a loss of a discount, and Basic does not contend either that compliance with the conditions imposed by the Drop Ship and Resale Policy would have been so difficult as to render the discount no longer functionally available to it, or that Basic's general policy prohibiting distributors from selling to other resellers itself violated the antitrust laws.

Plaintiff was warned by Basic of its non-compliance with the program and given an opportunity to comply, and its discount was only terminated when it continued to violate Basic's policy. Plaintiff thus voluntarily forewent its opportunity to receive the discount by continuing to violate Basic's policy, and Basic did not violate the Robinson-Patman Act by terminating Plaintiff's discount.

Finally, Plaintiff contends that other distributors who violated the Drop Ship and Resale Policy did not have their discounts terminated. But Plaintiff cites no instance where Basic knew of a repeated violation of its Drop Ship and Resale Policy by a distributor, and yet took no action. These allegations, then, do not create a genuine issue of material fact as to the availability of the discount to Plaintiff.

For all of the foregoing reasons, defendants' motion for summary judgment will be granted on Plaintiff's federal claims; and those claims, accordingly, will be dismissed.

### C. The State-Law Claims

As indicated, Plaintiff asserted only federal question jurisdiction pursuant to 28 U.S.C. §1331 in its complaint. The Court has now dismissed all of the claims over which it has original jurisdiction. Because the state-law claims are most appropriately addressed by the state courts, the Court declines to exercise supplemental jurisdiction over them and thus dismisses them, without prejudice. *See* 28 U.S.C. §1367(c)(3) (providing that "[t]he district courts may decline to exercise supplemental jurisdiction. . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2001) ("[T]he state-law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present.").

## IV. <u>CONCLUSION</u>

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants' April 28, 2006 Motion for Summary Judgment is GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's federal claims are DISMISSED WITH PREJUDICE.

The Court having declined to exercise supplemental jurisdiction over Plaintiff's state law claims,

IT IS FURTHER ORDERED that those state law claims are DISMISSED, without prejudice.

Let judgment be entered accordingly.

                                          s/Gerald E. Rosen
                                          Gerald E. Rosen
                                          United States District Judge

Dated: September 28, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 28, 2007, by electronic and/or ordinary mail.

                                          s/LaShawn R. Saulsberry
                                          Case Manager